**CASE NO. 22-11141-J**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

**Kameron Butler,**

*Appellant/Plaintiff*

-vs-

**Charlene Smith**,

*Appellee/Defendant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

---

**APPELLANT'S OPENING BRIEF**

---

| | |
|---|---|
| Craig Goodmark | Cary S. Wiggins |
| Ga. Bar No. 301428 | Ga. Bar No. 757657 |
| GOODMARK LAW FIRM | WIGGINS LAW GROUP, LLC |
| Suite 410 | Suite 401 |
| One West Court Square | 260 Peachtree Street, N.W. |
| Decatur, Georgia 30030 | Atlanta, Georgia 30303 |
| (404) 719-4848 | (404) 659-2880 |
| cgoodmark@gmail.com | cary@wigginslawgroup.com |

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

Listed below are the trial judge and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case:

Boulee, Hon. J.P. (USDC Judge)

Butler, Kameron

Chambless, Higdon, Richardson, Katz & Griggs, LLP

Clay, Frances L. (Attorney)

Goodmark, Craig (Attorney)

Goodmark Law Firm

Smith, Charlene

Wiggins, Cary S. (Attorney)

Wiggins Law Group, LLC

No publicly held corporation owns 10% or more of any party's stock.

This 26th day of August, 2022.

Respectfully submitted,

BY: /s/ Cary S. Wiggins
Cary S. Wiggins
Ga. Bar No. 757657

WIGGINS LAW GROUP, LLC
Suite 401
260 Peachtree St., NW
Atlanta, GA 30303
Telephone: (404) 659-2880
Facsimile: (404) 659-3274
cary@wigginslawgroup.com

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is requested. Interaction between counsel and the Court, it is believed, will offer a more complete context within which to assess the boundaries of qualified immunity. Here, it is alleged that a school resource officer assigned to a high school performed what is, at root, an incompetent child abuse investigation that the lead to the wrongful arrest of the plaintiff. Yet the District Court granted qualified immunity to the officer — and suggested that an officer does not lose qualified immunity if all the plaintiff can prove is that the officer made *recklessly* false statements in order to obtain an arrest warrant. This case presents an opportunity to explain why qualified immunity does not apply.

# TABLE OF CONTENTS AND CITATIONS

## <u>Contents</u>

Certificate of Interested Persons and
Corporate Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Contents and Citations

    – Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

    – Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Course of Proceedings and Disposition in the
           Court Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           The Butler Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           Charlene Smith: School Resource Officer . . . . . . . . . . . . . . 7

           Officer Smith and Jayden's relationship . . . . . . . . . . . . . . . 9

           Officer Smith and Jayden target Kameron . . . . . . . . . . . . . . 10

           The arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C.      Standard and Scope of Review . . . . . . . . . . . . . . . . . . . . . . . . . 18

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.     A genuine issue of material fact exists whether Officer Smith is
liable for malicious prosecution under § 1983. . . . . . . . . . . . . . . . . 20

     A.     Officer Smith's facts show a lack of arguable
probable cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          Subsection (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

          Subsection (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          The District Court erred in assessing the basis for
probable cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     B.     Officer Smith knowingly or recklessly used false
statements and material omissions to obtain a
warrant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II.    Kameron has stated a valid state-law claim for malicious
prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Certificate of Compliance with FRAP 32 . . . . . . . . . . . . . . . . . . . . . . . . A

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

Citations

Federal Cases

Carter v. Butts Cty., Ga., 821 F. 3d 1310 (11th Cir. 2016). . . . . . . . . . . . 22

Cozzi v. City of Birmingham, 892 F.3d 1288 (11th Cir. 2018) . . . . . . . . . 23

Daniels v. Bango, 487 F. App'x 532 (11th Cir. 2012) . . . . . . . . . . . . . 23, 41

District of Columbia v. Wesby, 138 S.Ct. 577 (2018). . . . . . . . . . . . . . . 22

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . 21, 22

Gates v. Khokhar, 884 F.3d 1290 (11th Cir. 2018) . . . . . . . . . . . . . . . . . 24

Grider v. City of Auburn, 618 F.3d 1240 (11th Cir. 2010) . . . . . . . . . . . 21

Holmes v. Kucynda, 321 F.3d 1069 (11th Cir. 2003) . . . . . . . . . . . . . . . 40

Kelly v. Curtis, 21 F.3d 1544 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 40

Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004) . . . . . . . 23, 24

Luke v. Gulley, 975 F.3d 1140 (11th Cir. 2020) . . . . . . . . . . . . . . . . . . . 20

Malley v. Briggs, 475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Manuel v. City of Joliet, 137 S. Ct. 911 (2017). . . . . . . . . . . . . . . . . . 20, 21

Norelus v. Denny's, Inc., 628 F.3d 1270 (11th Cir. 2010) . . . . . . . . . . . . 22

Sevigny v. Dicksey, 846 F. 2d 953 (4th Cir. 1988) . . . . . . . . . . . . . . . . . 23

Tillman v. Coley, 886 F. 2d 317 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . 23

United States v. Martin, 615 F.2d 318 (5th Cir. 1980) . . . . . . . . . . . . . . . . 40

Williams v. Aguirre, 965 F.3d 1147 (11th Cir. 2020). . . . . . . . .   20, 21, 22

State Cases

Adams v. Hazelwood, 271 Ga. 414 (1999). . . . . . . . . . . . . . . . . . . . . . . . 41

Allen v. State, 278 Ga. App. 292 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . 26

Bateast v. DeKalb Cnty., 258 Ga. App. 131 (2002) . . . . . . . . . . . . . . . . . 43

Beasley v. State, 161 Ga. App. 29 (1982). . . . . . . . . . . . . . . . . . . . . . . . . 25

Bosnak v. State, 263 Ga. App. 313 (2003) . . . . . . . . . . . . . . . . . . . . . . . . 26

Brown v. State, 356 Ga. App. 516 (2020) . . . . . . . . . . . . . . . . . . . . . . . . 27

Caby v. State, 249 Ga. 32 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

City of Atlanta v. Shavers, 326 Ga. App. 95 (2014) . . . . . . . . . . . . . . . . . 43

Copeland v. State, 263 Ga. App. 776 (2003). . . . . . . . . . . . . . . . . . . . 25, 26

Howell v. State, 180 Ga. App. 749 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 27

Keye v. State, 136 Ga. App. 707 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . 29

Knight v. State, 233 Ga. App. 819 (1998) . . . . . . . . . . . . . . . . . . . . . . . . .25

Lagroon v. Lawson, 328 Ga. App. 614 (2014) . . . . . . . . . . . . . . . . . . . . 43

Leslie v. State, 341 Ga. App. 731 (2017). . . . . . . . . . . . . . . . . . . . . . . . . 30

Pierre-Louis v. State, 329 Ga. App. 55 (2014). . . . . . . . . . . . . . . . . . . . . 30

<u>Rivera v. Washington</u>, 298 Ga. 770 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

<u>Sabbs v. State</u>, 248 Ga. App. 114 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>State v. Lawrence</u>, 262 Ga. 714 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

<u>Thomas v. State</u>, 73 Ga. App. 803 (1946) . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>White v. State</u>, 319 Ga. App. 530 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Wilson v. State</u>, 257 Ga. App. 242 (2002). . . . . . . . . . . . . . . . . . . . . . . . . 26

## <u>Other</u>

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

32 CFR § 66.6(b)(1)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Ga. Const. art. 1, § 2, ¶ IX(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

O.C.G.A. § 15-11-380 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

O.C.G.A. § 16-2-1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

O.C.G.A. § 16-5-70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

O.C.G.A. § 19-3-2(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

O.C.G.A. § 39-2-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

O.C.G.A. § 39-2-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

O.C.G.A. § 51-7-40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Restatement (Third) of Torts: Phys. & Emot. Harm § 2 (2010) . . . . . . . . 22

## JURISDICTIONAL STATEMENT

Jurisdiction in the District Court was conferred under 28 U.S.C. §§ 1331 and 1343(a)(3)&(4), because that court can entertain an action to redress a deprivation of rights guaranteed by the United States Constitution, and the Court has jurisdiction under 28 U.S.C. § 1367 to hear an action to redress a deprivation of rights guaranteed by the laws and the Constitution of the State of Georgia.  See also 42 U.S.C. § 1983.

Jurisdiction in this Court is conferred under 28 U.S.C. §1291. The District Court's final judgment was entered on March 22, 2022.  [Doc.73], and Kameron Butler's notice of appeal was filed on April 7, 2022.  [Doc. 75].

**STATEMENT OF THE ISSUES**

1.   Whether the District Court erred in concluding that no triable issue exists on Kameron Butler's malicious prosecution claim under § 1983 (i.e., whether the court erred in granting summary judgment to Officer Smith (a) upon reasoning no constitutional violation occurred, and, (b) after failing to reach and hold that Officer Smith is not entitled to qualified immunity)?

2.   Whether the District Court erred in concluding that no triable issue exists on Kameron Butler's malicious prosecution claim under O.C.G.A. § 51-7-40 (i.e., whether the court erred in granting summary judgment to Officer Smith (a) upon reasoning probable cause existed to arrest Butler, and, (b) after failing to reach and hold that Officer Smith is not entitled to official immunity)?

## STATEMENT OF THE CASE

**A.  Course of Proceedings and Disposition in the
Court Below.**

On July 10, 2019, Kameron Butler filed her complaint against Officer

Charlene Michelle Smith and the City of Conyers, Georgia . [Doc. 1.]

Officer Smith answered the complaint on September 23, 2019. [Doc.

9.]  The City moved to dismiss that same day.  [Doc. 8.]  On October 10,

Butler dismissed her claims against the City.  [Doc. 10.]

The parties pursued discovery, which was extended a few times

because of the COVID-19 exigent circumstances.

On March 15, 2021, Officer Smith moved for summary judgment.

[Doc. 53.]  Butler responded to that motion April 23, and a corrected brief

was filed on April 28.   [Docs. 65 & 68.]  Smith replied on May 6. [Doc.

70.]

March 21, 2022, the District Court entered an order granting Officer

Smith's motion for summary judgment, and the clerk entered judgment the

next day.  [Docs. 72 & 73.]

On April 7, Butler filed her notice of appeal.  [Doc. 75.]

**B.      Statement of Facts.**

*The Butler Family*

In September 2017, Kameron Butler was a working, single mother of three children: a 19-year-old daughter, a 9-year-old daughter, and a 17-year-old son, Jayden Butler.  Kameron had never been arrested before, let alone been accused of having committed a crime (other than minor traffic violations).  Her son, Jayden, was a fourth-year student at Rockdale County High School ("RCHS").  [Doc. 54 at 25:13-20 (although it was Jayden's fourth year of high school, he did not have enough credits to be a senior).]

Back in 2014, around his ninth-grade year, Jayden began experiencing educational failure, including fights at school, truancy and tardiness.  He was also earning failing grades.  [Doc. 54, K. Butler Dep. at 43:18-44:25.] Problems continued throughout Jayden's high school years, as Jayden had numerous encounters with the juvenile justice system.  On multiple occasions, Jayden's mother had to report him missing to local law enforcement.  [Id. at 26:6-3.]  During these years, Kameron worked selflessly and tirelessly to help her son by taking him to mental health professionals, including psychiatrists and psychologists.  [Id. at 28:15-29:8.]

When Jayden required more support, Kameron cooperated with the juvenile justice system fully, participating with the CHINS (Children In Need of Services, see O.C.G.A. § 15-11-380) program.  [Id. at 26:2-27:13; see also id. at 10:24-11:14.]

In the summer of 2017, the Butler family moved just outside of the school district for RCHS.  [Id. at 8:21-9:7, 33:22-34:4.] (The Butler's new home, Woodland Trace Apartments, is a five-minute drive from RCHS [id. at 31:15-20], and it is within walking and biking distance of the school [Doc. 55, Smith Dep. at 25:25-26:11].)  Despite the move, the school district permitted Jayden to continue attending RCHS (which was his preference) instead of transferring to Salem High School, which was in his new school district. [Doc. 56, J. Butler Dep. at 34:5-18.]

Because the Butler family was living just outside the RCHS school district (and thus not on a school bus route), Kameron would drive Jayden to  school in the morning.  [Id. at 33:22-34:4.]  Unbeknownst to Kameron, though, some days Jayden would walk in the front door of the school and walk out the back door.  [See Doc. 56 at 44:21-45:2.]  He would often go back to their apartment while she was at work.  [Doc. 54 at 45:1-46:5.]

Just weeks after the start of the 2017-2018 school year, the high school informed Kameron that Jayden was skipping school. [Id. at 71:17-72:24; Doc. 56 at 44:21-45:2.] Jayden would ask his mother or her fiancé to pick him up from school, but, when they would arrive, he would not be there. [Doc. 54 at 35:14-36:4.] Instead of going to school, Jayden would go to the "Brandon Glen" apartments where he would meet friends who did or sold illegal drugs. [Doc. 56 at 15:15-16:12, 52:5-8, 56:22-57:21 (admitting he went to Brandon Glen apartments, but explaining that he did so because he was instructed to leave campus); but see Doc. 54 at 48:25-49:7.] Kameron forbade Jayden from going to Brandon Glen because a drug dealer named Quest, who would "hang out" with Jayden, lived there. [Doc. 54 at 48:25-49:18.] Sometimes Jayden would go to Pine Log Park, where he would play football, basketball, or other outdoor sports. [Doc. 56 at 55:15-56:14; Doc. 55 at 99:10-19.] Kameron would call looking for Jayden, but he would block her phone. [Id. at 46:9-25.] Kameron went to an attendance conference at RCHS in August. [Doc. 54 at 71:17-72:23; Doc. 56 at 69:1-25.]

On those days Jayden actually stayed on campus after school,

Kameron would usually pick him up between 5:00 p.m. and 6:00 p.m. [Doc. 56 at 19:19-20:6; Doc. 54 at 35:1-13.]  Then again, sometimes Jayden would walk home to their apartment and, instead of waiting in the computer lounge where there are amenities, or waiting outside in the shaded gazebo, Jayden would get a key from the leasing office and go into their apartment. [Doc. 54 at 45:1-46:5, 56:21-57:8, 66:12-67:5.]

*Charlene Smith: School Resource Officer*

In 2017, the City of Conyers employed Charlene Smith as a School Resource Officer at Rockdale County High School.  [Doc. 55 at 7:25-8:21.]

A School Resource Officer, as the name suggests, is a police officer assigned to a school to help prevent crime and violence and enhance safety on school grounds.  According to a Memorandum of Understanding for the SRO program (dated May 6, 2015), an SRO assigned by the City of Conyers police department to work in the Rockdale County Public School District is subject to the rules and regulations, policies and procedures, and training requirements of the City's police department.  [Doc. 61, Washington Dep. at 73:6-23; Doc. 60, Greene Dep. at 25:10-18.]  The City's Chief of Police must provide a sworn officer to be assigned to Rockdale County High

School. [Doc. 59-2 at 59 (p. 3 of 13, Section 2.01).]

According to the Memorandum, "the SRO shall adhere to the Rockdale County Public Schools' rules and regulations ('RCPS Rules') while on the school campus, unless the RCPS Rules and regulations conflict with the CPD rules, in which case the CPD rules shall govern." [Doc. 59-2 at 59 (p. 3 of 13, Section 2.04).]

Among the duties and responsibilities of the SRO are:

- "To serve as a positive roll model and mentor to students."

- "To provide law enforcement information to school-based staff members ... to help meet the needs of students."

- "To enforce laws, to conduct criminal investigations, to help prevent crime and violence, and to enhance overall safety on school grounds."

[Doc. 59-2 at 65 (p. 9 of 13, Section I(A)); Doc. 60 at 23:9-25:5.] An SRO is not certified in guidance counseling or as a social worker. [Id. at 26:16-25.]

The SRO works primarily "a Monday through Friday schedule," a schedule which should "closely follow the school schedule." [Doc. 59-2 at p. 67 (p. 11 of 13, Section I(B)); Doc. 59, Perry Dep. at 19:25-20:7.]

*Officer Smith and Jayden's relationship*

In 2017 Jayden (who would turn 18 years of age in February 2018) and Officer Smith would eat lunch together almost every day he was at school. [Doc. 55 at 27:14-24; Doc. 61 at 22:3-22; Doc. 56 at 10:4-16, 62:21-63:8.] Smith gave Jayden a bicycle and, at times, money. [Doc. 55 at 25:7-24, 36:23-38:12; Doc. 56 at 73:23-74:9.] Jayden complained about his mother to Smith, confiding in her that he did not like his mother's fiancé, Montrez Porter. [Doc. 55 at 24:4-20, 61:1-20; see also Doc. 61 at 39:14-23.][1] When questioned by his mother about cleaning up his room or doing homework, Jayden would sometimes respond that Officer Smith said he did not have to do such things. [Doc. 54 at 38:8-39:7.] Once, when Kameron was talking to Jayden about transferring him to Salem High School, Jayden responded that she could not "keep [me] away from" Officer Smith. [Doc. 54 at 73:10-74:18; see also id. at 49:25-50:21; Doc. 56 at 58:13-59:3.]

---

[1] At times the SROs claim they were unaware of any behavioral or academic issues with Jayden. [See, e.g., Doc. 61 at 17:5-9, 24:12-25:3, 50:23-51:7, 69:11-25; Doc. 57 at 17:9-18:15, 51:21-52:19.] Yet, at other times, the SROs seem to acknowledge Jayden was a troubled student. [See, e.g., Doc. 61 at 17:10-18:13; Doc. 55 at 35:3-36:19.] The use of confidential school records by the SRO is prohibited except as authorized by law. [Doc. 59-2 at 69 (p. 13 of 13, Section II(A).] In any event, no one contends that Kameron's then-fiancé, Porter, had any physical interaction with Jayden. [See, e.g., Doc. 54 at 40:22-41:21.]

On more than one occasion, Officer Smith drove Jayden to his apartment from school without permission from Kameron.  [Doc. 55 at 60:1-18; but see Doc. 61 at 56:12-58:3 (inappropriate for SRO to drive student anywhere before contacting parent).][2]

*Officer Smith and Jayden target Kameron*

On September 27, 2017, after the 3:05 p.m. school bell, while Jayden was in Officer Smith's office, she used her speaker phone to call Kameron, insisting that Kameron pick up Jayden from school.  [Doc. 62, Ex. 2 (telephone call).][3]  Kameron said that Jayden could walk home, or she could pick him up from or near the school but it would be closer to 5:45 p.m.  [See Doc. 65-4 at 3.]  Officer Smith suggested to Kameron that she was guilty of cruelty to children.  [Id.; Doc. 57 at 71:24-72:3; Doc. 62, Ex. 2 at 3:40; Doc.

---

[2] Officer Smith was later reprimanded by Conyers Captain D. C. Parker for driving Jayden on multiple occasions without documenting the trips.  [Doc. 55 at 126:21-127-21.] According to the City of Conyers police department, it is against policy for SROs to transport students to and from school.  [Doc. 59 at 34:8-24, 37:25-40:4; Doc. 60 at 28:8-13 (SROs are not contracted to provide transportation to students), id. at 29:8-11 (same); Doc. 57, Quick Dep. at 28:20-29:18.]

[3] For convenience's sake, the undersigned has unofficially transcribed this telephone call (and the other audio recording by Jayden).  [See Doc. 65-4, Def.'s Ex. 2 at 1-8.]

65-4 at 3.][4] During this phone call, Kameron told Officer Smith that she was misinformed and that there was more to the story than what Jayden was telling her. [Doc. 62, Ex. 2 at 2:10; Doc. 65-4 at 2-3] Kameron explained that Jayden had displayed serious problems ever since the ninth grade, that Jayden was falling further behind in school, that Jayden had been referred to the CHINS program twice, and that his counselor knew about these issues. [Doc. 62, Ex. 2 at 2:20 & 6:40; Doc. 65-4 at 2-3.] Kameron explained, however, that she was at work and could not elaborate on Jayden's issues during the phone call. [Doc. 62, Ex. 2 at 2:10; Doc. 65-4 at 2.]

At the end of the call, Kameron offered to pick up Jayden at the nearby Pine Log Park or the school, but Jayden said he would walk home. [Doc. 62, Ex. 2 at 9:46 & 12:04; Doc. 65-4 at 8.] Kameron was adamant that no one from the school was authorized to drive Jayden home, and she told Jayden that he was forbidden to go to the Brandon Glen apartments. [Doc. 62, Ex. 2 at 10:20; Doc. 55 at 102:25-103:5; Doc. 65-4 at 5, 7.]

---

[4] Up to that point, even though Jayden had stayed on campus after hours a number of times (while, for example, assisting the wrestling coach), no one from the school had told Kameron that Jayden was prohibited from staying at the school after 3:30 p.m. [Doc. 54 at 37:6-18, 41:22-42:18; Doc. 55 at 78:1-18.]

Soon after her phone call with Officer Smith, Kameron called the high school and spoke with an assistant principal to arrange a meeting to talk about Jayden's issues. [Doc. 54 at 39:8-40:4, 60:18-62:16.] She had previously spoken with a school guidance counselor, Dustin Allen, about Jayden's behavioral issues. [Id. at 47:1-48:19.]

When Kameron arrived home, she discovered that Jayden was not there. [Doc. 54 at 57:21-58:19.] Later that night, Jayden called his mother from the Brandon Glen apartments, insisting that she pick him up. [Doc. 56 at 17:9-21; Doc. 62, Ex. 3 at 0:38; see Doc. 65-4 at 8-12.] (Jayden had done this many times before. [Doc. 54 at 35:22-36:4, 46:18-25.]) During this call, which Jayden was surreptitiously recording, Jayden displayed his defiant and disrespectful nature, repeatedly telling his mother that she needed to drive to the Brandon Glen apartments and pick him up. [See Doc. 65-4 at 8-12.] Kameron referred to Officer Smith as "that bitch" and refused to drive to Brandon Glen. [Doc. 62, Ex. 3 at 0:45; Doc. 65-4 at 9.] Jayden's response: "You know this only makes the situation worse, right?" [Doc. 65-4 at 10.] The phone call ended like this:

KB: [Officer Smith] asked you right then and there

> where you were gonna go?  Were you going to
> stay at the school or were you gonna go to Pine
> Log?  And you told her that you didn't wanna do
> either one because you didn't wanna be in the
> heat.  So you told her to tell me that you were
> walking home. That's where I though[t] you was
> gonna be at.  When I got home, you weren't there.
> I have left out again.  So, you can get a ride to the
> house and I'll let you in when I get there.  But I'm
> not going to Brandon Glen.  I told her that and I
> told you that.  I can go to Brandon Glen, but I
> won't.

JB:    Alright.  That's all I need you to say.  Alright.  Bye.

[Doc. 65-4 at 12.]

Shortly after 6:30 p.m. that day, Jayden sent a text to Officer Smith (and SROs Washington and Quick) to say that his mom would not pick him up from the Brandon Glen apartments.  [Doc. 61 at 42:9-43:3.]  Later that night Smith went to the Brandon Glen apartments to pick up Jayden and drove him home.  [Doc. 55 at 81:2-82:1.]

The next day, at around 6:20 a.m., Jayden sent a text to Officer Smith containing the audio of his phone call with his mother from the night before. [Doc. 62, Ex. 3; Doc. 55 at 103:17-104:9.]  Smith listened to the entire call. [Id. at 67:1-68:2, 103:17-104:9.]  Later that day, Jayden provided a written

statement to Officer Smith in her office, in which he complained about not getting along with his mother's fiancé (Porter), and about having to stay at the school until 5:45 p.m. to be picked up. [Doc. 56 at 29:22-24; Doc. 55 at 71:3-21.] Jayden's guidance counselor, Dustin Allen, contacted DFCS about Jayden's situation. Although Officer Smith now denies being angered when hearing Kameron refer to her as a bitch, Smith has no reason to doubt the accuracy of the notes of Jessika David (a DFCS employee) recounting that Smith felt disrespected by the comment. [Doc. 55 at 66:22-68:10, 104:10-25; Doc. 58, Beaucher Dep. at 92:21-93:5.]

*The Arrest*

On the same day, Officer Smith applied for warrants to arrest Kameron on charges of cruelty to children under O.C.G.A. § 16-5-70. [Doc. 55 at 131:19-132:14.][5] Once she decided to apply for the arrest warrants, Smith did not consult with RCHS's social worker, DFCS caseworkers, or

---

[5] Officer Smith has testified that she did not contact DFCS, even though she claims that she suspected child neglect of Jayden, because Allen had already made a referral. [Doc. 55 at 119:5-9.] A couple of facts must be inferred here. First, Smith and Allen were contemplating the same bases for potential child neglect; that is, they both were contemplating the events of September 27. [See Doc. 55 at 52:9-22.] And second, even though Allen told Smith that DFCS usually takes 24 hours to respond on a referral, Smith was not going to wait that long. [Doc. 55 at 56:22-57:10.]

Jayden's mental health counselor.  [Doc. 55 at 116:10-117:7; Doc. 61 at 80:21-81:6.]  She did, however, ask Jayden whether he wanted to have his mother arrested.  [Doc. 61 at 26:23-28:9.]

An SRO must follow protocol for investigating child abuse or neglect.  [Doc. 59 at 22:22-23:16, 26:17-27:2.]  This includes reporting cases of suspected child neglect to DFCS.  [Id. at 31:12-32:9.]  Officer Smith did not follow the most basic guidelines for investigating a case of child neglect.  [Doc. 55 at 54:12-18, 115:25-116:23, 55:3-19 (Smith unaware of what DFCS looks for when investigating child endangerment).]

In her warrant applications, Smith alleged that Kameron "refused to pick her son, Jaylen [sic] Butler, up from school," and that he had to take "Uber home."  Smith swore that "when [Kameron] leaves her son ... up at Rockdale county High School from 15:05 until approximately 19:00 hrs. without food or water to indure [sic] the heat."  Smith swore that Jayden had a "heart condition" and thus "should not indure [sic] long periods without food, water or heat [sic]."  [Doc. 55 at 129:10-17; Doc. 55-2 at 56-59 (Ex.

15).][6] Officer Smith did not state Jayden's age in her warrant affidavits. Nor did Smith mention anything about Jayden's ongoing behavioral or academic problems while at RCHS, or Kameron's ongoing efforts to help her son.

Officer Smith knows that "leaving" a 17-year-old on campus for two hours (even without water) is not cruelty to children. [Doc. 55 at 147:2-18.] Leaving a young man on campus to play basketball after school is not cruelty, either. [Id. at 88:25-90:15.] In fact, had Jayden been doing anything (e.g., walking around, doing homework) on campus after hours with the school's permission, it would not be cruelty to children. [Id. at 145:2-14.]

Having obtained the arrest warrants, later that night at around 8:48 p.m., Officer Smith sent a text message to Jayden to, as she put it, "see if he was in the house." [Doc. 55 at 105:13-106:11.] When he did not immediately respond, and at around 9:00 p.m., Smith called the Rockdale

_____

[6] Earlier in the school year, Jayden had told the SROs that he had a "heart condition," but they did *nothing* to verify that claim, much less learn what the alleged condition was. [See Doc. 55 at 38:20-41:1, 147:19-148:1; Doc. 57 at 78:14-79:20; Doc. 61 at 91:22-92:7.] Truth is, and apparently this is disputed, Jayden had no discernable heart condition. [See Doc. 54 at 69:9-71:1; id. at 77:21-78:3.]

County Sheriff's Office and asked them to perform a "welfare check" on Jayden at his residence: She informed the department's dispatch that there were "outstanding warrants on Kameron Butler ... for three counts of cruelty to children." [Doc. 55 at 106:2-108:6.] Officer Smith says she was simply following up because Jayden "had been staying and sitting outside so long." [Doc. 55 at 107:22-108:2.] And Smith says that she informed the dispatcher about the arrest warrants "for safety reasons." [Id. at 110:13-14.]

Later the night, RCSO deputies went to Kameron's residence to perform Smith's requested welfare check. [See Docs. 65-3 & 69 (RCSO dash cam of arrest).] Jayden was fine, but the officers were compelled to arrest Kameron on the active warrants. [Doc. 54 at 62:6-8.] Kameron spent the next four days in jail before she was able to bond out. [Id. at 62:20-63:25.]

The criminal charges against Kameron were dismissed in January 2018. [Id. at 63:4-11.][7]

---

[7] Apart from Kameron's situation, the City of Conyers is unaware of another instance where one of its SROs has taken out an arrest warrant on a student's parent. [Doc. 59 at 16:16-17:15.]

**C.** **Standard and Scope of Review.**

This Court reviews a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the party opposing the motion. <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1085 (11th Cir. 2004). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## SUMMARY OF THE ARGUMENT

This case concerns a single mother whose unruly 17-year-old son manipulated a school resource officer into submitting a materially misleading arrest warrant applications, in which the officer accused the mother of child neglect.  Nothing could have been further from the truth.

Officer Charlene Smith developed a close relationship with a fourth-year high school student, Jayden Butler.  They ate lunch together most days of the week.  She gave him money and drove him places after school hours.  Jayden confided in Officer Smith that he did not get along with his mother's boyfriend.  After Jayden gave Smith a recording of a phone call with his mother (Kameron Butler) in which referred to Smith as "that bitch," Smith applied for arrest warrants alleging cruelty to children.  The warrants not only failed to state a discernable crime, they included false and reckless representations and material omissions.

Officer Smith believes that she performed a competent investigation for child abuse.  She plainly did not.  Because the record reveals disputed material facts, Office Smith was not entitled to summary judgment on Kameron Butler's federal and state malicious prosecution claims.

**ARGUMENT**

**I.     A genuine issue of material fact exists whether Officer Smith is liable for malicious prosecution under § 1983.**

To prevail on the constitutional tort of malicious prosecution, Kameron must show a seizure pursuant to invalid legal process that ultimately terminated in a manner not inconsistent with her innocence. Luke v. Gulley, 975 F.3d 1140, 1293, 1295 (11th Cir. 2020).  Officer Smith does not challenge that Kameron was seized under a warrant or that the prosecution terminated in Kameron's favor.  Nor did Smith challenge that a determination that the legal process is invalid would obviate any requirement for a finding of malice.  Thus, the question for the Court, and ultimately for a jury, is whether the evidence shows "invalid" or "constitutionally infirm" legal process.  Williams v. Aguirre, 965 F.3d 1147, 1165 (11th Cir. 2020).  Such process occurs when "[l]egal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement."  Manuel v. City of Joliet, 137 S. Ct. 911, 918–19 (2017).

This Court recognizes two independently sufficient ways to show

invalid legal process. First, legal process is constitutionally infirm where the officer who applied for the warrant should have known that her application failed to establish probable cause. See Williams, 965 F.3d at 1165. This route is based on Malley v. Briggs, 475 U.S. 335, 344–45 (1986) and its progeny, and it reflects the well-known arguable probable cause standard. [See Doc. 53-2 at 18 (discussing arguable probable cause).] The arguable probable cause standard is also the measure of whether an officer is entitled to qualified immunity. Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010). The "should have known" language, Williams, 965 F.3d at 1165, points to an objective standard, which is the norm in Fourth Amendment jurisprudence.[8]

Under the second route, legal process is infirm where an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant. Williams, 965 F.3d at 1165. This prong is based on Franks v.

---

[8] See Manuel, 137 S. Ct. at 925 (Alito, J., dissenting) ("[W]hile subjective bad faith, i.e., malice, is the core element of a malicious prosecution claim, it is firmly established that the Fourth Amendment standard of reasonableness is fundamentally objective. These two standards -- one subjective and the other objective -- cannot co-exist.") (citation omitted).

21

<u>Delaware</u>, 438 U.S. 154 (1978), and the case law built upon its foundation. The <u>Franks</u> standard is largely subjective, although the law recognizes both objectively and subjectively reckless conduct.[9]  Under the <u>Franks</u> prong, the qualified immunity question is whether there was actual probable cause -- not arguable probable cause -- because it has long been established that an officer cannot intentionally or recklessly lie to arrest someone without probable cause.  <u>Williams</u>, 965 F.3d at 1169.

On Kameron's evidence, she prevails under either route.

**A.    Officer Smith's facts show a lack of arguable probable cause.**

Whether a reasonable officer could have believed she had probable cause to arrest "depends on the totality of the circumstances," <u>District of Columbia v. Wesby</u>, 138 S.Ct. 577, 586 (2018).  The arguable probable cause "standard does not shield officers who unreasonably conclude that probable cause exists." <u>Carter v. Butts Cty., Ga.</u>, 821 F. 3d 1310, 1320 (11th Cir. 2016).  An officer arresting a citizen without arguable probable

---

[9] <u>See</u> Restatement (Third) of Torts: Phys. & Emot. Harm § 2 (2010) ("A person acts recklessly in engaging in conduct if: (a) the person knows of the risk of harm created by the conduct *or knows facts that make the risk obvious to another* in the person's situation") (emphasis added); <u>Norelus v. Denny's, Inc.</u>, 628 F.3d 1270, 1282 (11th Cir. 2010) (sanctions for "objectively reckless" attorney conduct).

cause violates clearly established law and thus is not entitled to qualified immunity. Cozzi v. City of Birmingham, 892 F.3d 1288, 1297–98 (11th Cir. 2018) (internal alteration adopted; citation omitted).

Significantly, in evaluating probable cause, an officer may not "unreasonably disregard [ ] certain pieces of evidence" by "choos[ing] to ignore information that has been offered to him or her" or "elect[ing] not to obtain easily discoverable facts" that might tend to exculpate a suspect. Kingsland v. City of Miami, 382 F.3d 1220, 1229, 1233 (11th Cir. 2004) (citing Sevigny v. Dicksey, 846 F. 2d 953 (4th Cir. 1988) ("Objective inquiry into the reasonableness of an officer's perception of the critical facts leading to an arrest ... must charge him with possession of all information reasonably discoverable by an officer acting reasonably under the circumstances.")).

The Court may also consider the presence or absence of any exigency. If a law enforcement officer is not faced with an immediate need to make an arrest, this Court has held that there is no need for "such a cursory investigation." Daniels v. Bango, 487 F. App'x 532, 538 (11th Cir. 2012); see also Tillman v. Coley, 886 F. 2d 317, 321 (11th Cir. 1989) ("This is not

a case where time was of the essence in making the arrest.").  That is, where

"the officer 'simply did not bother to do what any police officer acting

reasonably in the circumstances would have done to clarify the factual

situation' and that '[t]here was no exigency which prevented his doing so,'"

there could be no arguable probable cause.  Kingsland, 382 F.3d at 1229.

In this case, Officer Smith applied for arrest warrants under two

subsections of O.C.G.A. § 16-5-70, which provide:

> (a)  A parent, guardian, or other person supervising the welfare of or having immediate charge or custody of a child under the age of 18 commits the offense of cruelty to children in the first degree when such person *willfully deprives* the child of *necessary sustenance* to the extent that the *child's health or well-being is jeopardized*.
>
> ....
>
> (c)  *Any person* commits the offense of cruelty to children in the second degree when such person *with criminal negligence* causes a child under the age of 18 *cruel or excessive physical or mental pain*.

O.C.G.A. § 16-5-70 (emphasis added).  On Kameron's facts, arguable

probable cause did not exist for either charge.  See Gates v. Khokhar, 884

F.3d 1290, 1298 (11th Cir. 2018) (existence of probable cause or arguable

probable cause "depends on the elements of the alleged crime and the

operative fact pattern") (citation omitted).

## Subsection (a)

"Sustenance," as used in subsection (a), has consistently been defined as that necessary food and drink which are sufficient to support life and maintain health. <u>See</u>, <u>Copeland v. State</u>, 263 Ga. App. 776, 779 (2003); <u>see also</u> <u>State v. Lawrence</u>, 262 Ga. 714 (1993); <u>Caby v. State</u>, 249 Ga. 32 (1982). These are malnourishment prosecutions. Examples of child malnourishment cases include:

- where the lack of material in both the stomach and the gastrointestinal tract precluded a finding that the child had succumbed from the effects of malabsorption syndrome, and thus, the evidence supported a finding that the infant's death was due to severe growth retardation secondary to malnutrition with marked dehydration.[10]

- where the defendant's four-month-old child was found severely malnourished, even though there was food in the house to feed the child properly and the child's mother and children received WIC food and formula vouchers.[11]

- where the defendant's three-month-old child was underweight and severely malnourished to the point where it was too weak to feed and had to be fed initially through a naso-gastric tube, that defendant fed the child sugar water to avoid bothering with

---

[10] <u>Beasley v. State</u>, 161 Ga. App. 29 (1982).

[11] <u>Knight v. State</u>, 233 Ga. App. 819 (1998).

making formula, and that defendant sometimes propped up a bottle near the child instead of feeding the child.[12]

- where the doctor stated that the defendant's two-month-old child was suffering from one of the worse cases of malnutrition that the doctor had ever seen, as shown by the child's sunken eyeballs, delayed capillary refill, increased turgor of the skin, and poor reaction to the environment.[13]

- where the defendant's live-in love interest's two-year-old twins were severely malnourished as shown by medical, photographic, and testimonial evidence included a doctor's testimony that the children had no subcutaneous fat, had bulging abdomens, could make sounds but not say any words, could not bear weight, had very delayed bone development, were severely malnourished, had no medical reason for their failure to thrive, and gained about as much weight during their first six weeks in foster care as they had in two years under defendant's care.[14]

- where a pediatrician testified that a child victim's reflux condition could not have caused the degree of malnourishment that the pediatrician found in the victim, and that the child's extreme failure to thrive was caused by a failure to feed the child, and the state presented evidence that the victim was not fed.[15]

Where the State has attempted to apply "necessary sustenance" to

---

[12] Wilson v. State, 257 Ga. App. 242 (2002).

[13] Bosnak v. State, 263 Ga. App. 313 (2003).

[14] Copeland, 263 Ga. App. 776.

[15] Allen v. State, 278 Ga. App. 292 (2006), cert. denied, No. S06C1307 (Ga. July 13, 2006).

mean more than "that necessary food and drink which is sufficient to support life and maintain health," the efforts have failed. <u>See, e.g.</u>, <u>State v. Lawrence</u>, 262 Ga. 714 (1993) (declining to expand definition of "necessary sustenance" to include oxygen where residence was set on fire); <u>Caby</u>, 249 Ga. at 33 (holding § 26-2801(a) is "not designed to reach legitimate child rearing functions, nor could it reasonably be so construed."); <u>Howell v. State</u>, 180 Ga. App. 749, 751-52 (1986) (denial of "sustenance" does not include the denial of necessary and appropriate medical care for a child under 18 years of age).

To violate § 16-5-70(a) requires more than depriving a child of sustenance (e.g., an after-school snack or a bottle of water), or even depriving a child of 'necessary sustenance sufficient to support life.' Instead the deprivation itself must be *willful*. <u>See</u> <u>Brown v. State</u>, 356 Ga. App. 516 (2020) (where oldest child's double black eyes, as well as dire condition of victims who were underweight compared to defendant mother's healthy condition, the mother's intention was willful such that the mother's convictions for cruelty to children in the first degree were proper).

Here, in Officer Smith's warrant application supporting her belief that

Kameron violated subsection (a), she swore in full:

> Kameron Butler committed the offence [sic] of cruelty to children when she refused to pick up her son, Jaylen [sic] Butler, up from school. Jaylen [sic] Butler was told to stay in front of the school from 1505-1900 hours. Kameron Butler allowed her boyfriend, Montrez, to pick up the little sister at C.J. Hick [sic] at approximately 1430 hours. Montrez will not pick Jaylen [sic] Butler up from school, but the schools are across the street from each other. On 9/25 Jaylen [sic] Butler took Uber home and had to sit outside until 9:00. 9/26 Kameron Butler had to go over to a friends's [sic] house because his mother wouldn't pick him up.

[Doc. 55-2 at 56; see also Doc. 55 at 129:10-132:14.]

The affidavit is gapingly deficient. Nowhere does it state, or even suggest by innuendo, that Kamreon had willfully deprived Jayden of 'necessary food and drink which is sufficient to support life and maintain health.' Nor could it. Not only did Jayden have all the food and drink he wanted [see, e.g., Doc. 54 at 42:19-43:3], he regularly ate lunch with the SROs [Doc. 55 at 15:4-19, Doc. 61 at 22:3-11, Doc. 56 at 62:3-20], and he was nearly 18 years old.[16] Officer Smith knew, or should have known, that

---

[16] A 17 year-old can join the military. See 32 C.F.R. § 66.6(b)(1)(i). In Geogia, anyone over 16 years of age can work in a "mill, factory, laundry, manufacturing establishment" or workshop or in any occupation which has been designated as hazardous, O.C.G.A. § 39-2-1, even between the hours of "9:00 P.M. and 6:00 A.M.," § 39-2-2. And with parental consent, a 17 year-old can marry. See O.C.G.A. § 19-3-2(b)(4).

this warrant application failed to establish arguable probable cause for a violation of subsection (a).

**Subsection (c)**

The offense of cruelty to children in the second degree occurs when a "person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." O.C.G.A. § 16-5-70(c). The Georgia legislature has defined "criminal negligence" as "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." O.C.G.A. § 16-2-1(b). "Criminal negligence," as used in Georgia's criminal statutes, is "not merely such negligence as might be the foundation of a damage suit, but reckless and wanton negligence and of such a character as to show an utter disregard for the safety of others who might reasonably be expected to be injured thereby." Keye v. State, 136 Ga. App. 707, 708 (1975) (quoting Thomas v. State, 73 Ga. App. 803, 809 (1946)).

Examples of "cruel or excessive physical or mental pain" cases, as contemplated under subsection (c), include:

- where the defendant caused pain by squeezing the child and causing serious abdominal injuries to the child and by failing to

seek medical treatment for the fractured bones in both arms suffered by the child while the defendant and the child's parent were jointly caring for the child.[17]

- where evidence undisputed that the two-year-old victim was asleep throughout the assault of the child's mother because the mother testified that the two-year-old was shaking just after the mother called 911.[18]

- where the defendant locked his seven year-old son in a wooden box that had no holes for light or air to enter, which the defendant built for the specific purpose of placing his son inside it to calm him down; to discipline him; and to teach him to behave, listen, and follow orders when other forms of punishment did not work.[19]

- where mother's boyfriend stood by and failed to intervene while the mother repeatedly struck her crying child with a tree branch, inflicting multiple injuries, the jury was authorized to conclude that the boyfriend had failed to intervene to prevent the injuries, thereby demonstrating a wilful, wanton, or reckless disregard for the child's safety.[20]

Here, in the warrant application in support of a subsection (c) violation, Officer Smith swore in full:

Kameron Butler committed the offense cruelty to children in the second degree when she leaves her son, Jayden Demille

---

[17] Sabbs v. State, 248 Ga. App. 114 (2001).

[18] White v. State, 319 Ga. App. 530 (2013).

[19] Leslie v. State, 341 Ga. App. 731 (2017).

[20] Pierre-Louis v. State, 329 Ga. App. 55 (2014).

> Butler up at Rockdale County High School from 1505 until approximately 1900 hours without food or water, and to indure [sic] the heat. Jayden Butler has a heart condition (irregular heartbeat) and should not indure [sic] long periods without food, water or heat.

[Doc. 55-2 at 58; <u>see also</u> Doc. 55 at 137:18-138:4.] Like her other warrant application, this one, too, is senseless. It essentially says that Jayden is remaining on campus immediately following school (without food or water), and that Jayden has a "heart condition." Yet Officer Smith had no idea what the alleged 'heart condition' was, or if Jayden really had a condition, and, if so, whether remaining on campus for two to three hours after the last bell could possibly aggravate that heart condition. What she did know -- or should have known -- was that Kameron's inability to shuttle Jayden home from school at 3:05 p.m. (last bell) was not causing "excessive physical or mental pain," as defined by Georgia's child abuse statute.

<div align="center">

**The District Court erred in assessing
the basis for probable cause**

</div>

On summary judgment, the District Court held that Officer Smith had "first hand knowledge or reasonably trustworthy information of the following facts and circumstances:

- On multiple occasions, Jayden remained at school as late as 6:00 PM, waiting outside in the heat without access to food or water;

- Jayden's options for getting home included waiting for Plaintiff to retrieve him from school at or after 5:00 PM, which was not allowed under school policy; walking two hours home; or walking thirty minutes home and crossing the interstate;

- Even if Jayden found a way home when school ended, he had no way of accessing the apartment and would have to wait outside;

- Jayden suffered from a heart condition that might place his health at risk; and

- Jayden was upset about his school pickup situation.

[Doc. 72 at 19-20.]

None of these "facts" are material to a charge of cruelty to children under subsections (a) or (c). Regardless, as explained below, these facts are not reasonably trustworthy as a matter of law, nor are most of them based on firsthand knowledge. By relying on them to find arguable probable cause, the District Court has improperly given Officer Smith favorable inferences at the summary judgment stage.

Remaining at school after hours. The District Court stated "[o]n multiple occasions, Jayden remained at school as late as 6:00 PM, waiting

outside in the heat without access to food or water." It is true that Jayden remained on campus some days. But as for "food or water," other than Jayden telling Smith that he had no access to food and water (as incredulous as that sounds), no one questioned whether Kameron had food and water at home that Jayden could bring to school (or to the park) while waiting for Kameron to pick him up.[21] Never mind that a 17-year-old child not having his mother pack him a snack between lunch and dinner is not child neglect. [Doc. 54 at 140:24-143:18.] The District Court noted that "Jayden told [Smith] that *at times*, he did not have food at home, and [Smith] witnessed Jayden without food or water after school." [Doc. 72 at 22 (emphasis added, citation omitted).] This un-investigated "fact," even were it true, would not remotely qualify as willful malnourishment supporting a cruelty to children charge.

Options to get home. The Court stated "Jayden's options for getting home included waiting for [Kameron] to retrieve him from school at or after 5:00 PM, which was not allowed under school policy; walking two hours

---

[21] Officer Smith testified that her warrant application was based on Jayden not having food while waiting for his mother on campus, not for a lack of food at home. [Doc. 55 at 144:12-23.]

home; or walking thirty minutes home and crossing the interstate."   This is both inaccurate and immaterial.  In addition to using Uber or getting a rides from friends [Doc. 56 at 70:8-11], Jayden had the option of going to the park after school.[22]  The record shows that the walk home was just over three miles, and it would take about one hour (not two), and he would not have to cross the interstate illegally.  [See Doc. 65-1 at 6 (No. 16 (citing 65-2)).]

Waiting outside at home. The District Court stated that "[e]ven if Jayden found a way home when school ended, he had no way of accessing the apartment and would have to wait outside."  This, too, is both immaterial and misleading. Jayden had the option of waiting in his apartment leasing office's computer lounge where there are amenities, or waiting outside in the shaded gazebo.  [Doc. 54 at 45:1-46:5, 56:21-57:8, 66:12-67:5.]  Keeping the apartment key from Jayden was a parenting decision, as Jayden had repeatedly skipped school with troubled friends to

---

[22] The District Court added that "Pine Log Park was not a safe place to wait after school."  [Doc. 72 at 21.]  This nebulous fact itself, which is based on the opinion of Officer Smith and her fellow SROs, is immaterial and self-serving.  Jayden played basketball at this county park plenty of times without incident.  [Doc. 54 at 42:12-18; Doc. 56 at 56:9-14.]

go to the apartment, where he stole money from his mother.  [Doc. 54 at 43:18-44:25.]  Jayden could have gone home (Montrez took Kameron's younger daughter home from school), but Jayden did not like Montrez. [Doc. 56 at 16:13-24.]

The heart condition. The District Court recited as "fact" that "Jayden suffered from a heart condition that might place his health at risk."  This is not true (or it is disputed).  [See Doc. 54 at 69:9-71:1.]  Recognizing this dispute, the court held that Officer Smith's "belief that Jayden suffered from such a condition was reasonable. He told her that he did, and he wore a heart monitor. [Kameron] may dispute whether Jayden did, in fact, have this particular ailment, but she does not and cannot dispute that [Smith]'s belief was reasonable."  [Doc. 72 at 21-22.]  Kameron *does* dispute that Smith's belief was reasonable.  Jayden's veracity was subject to serious question, but, more to the point, wearing a Holter monitor does not mean that you have a heart condition; it is a means of detecting whether a heart condition might exist.

Jayden was upset.  Finally, the District Court noted that "Jayden was upset about his school pickup situation."  This is undoubtedly true, but that is not Kameron's fault.  And it is not material, either.

**B.      Officer Smith knowingly or recklessly used false statements and material omissions to obtain a warrant.**

Taking Kameron's facts as true, a reasonable jury could find that Officer Smith made the following false statements to the magistrate either knowingly or recklessly:

- That Kameron "refused to pick her son, Jaylen [sic] Kameron, up from school," and that he had to take "Uber home."

- That Kameron "leaves her son ... up at Rockdale county High School from 15:05 until approximately 19:00 hrs. without food or water to indure [sic] the heat."

- That Jayden had a "heart condition" and thus "should not indure [sic] long periods without food, water or heat [sic]."

[Doc. 55-2 at 56-59.]

The District Court reasoned that Kameron offered "no 'affirmative evidence'" showing that Officer Smith made these statements knowing them to be untrue or with reckless disregard for the truth.  [Doc. 72 at 25.]  This is

36

incorrect.  First, Kameron did not "refuse[]" to pick up Jayden.  The record shows that she routinely picked him up from school or the park, but many times he left school with friends -- against her wishes -- to go to the Brandon Glen apartments.  Kameron would arrive at school unable to find Jayden, and, when she would called, Jayden would block her phone.

Kameron did not "leave[] her son" at the high school.  He could simply have walked to the park, or walked or biked home to where his younger sister likely was with Kameron's fiancé.  Why Smith would say that Jayden had no "food or water," as though that were a crime, is reckless and fails to comprehend malnourishment cases of child cruelty.  After all, Smith routinely ate lunch with Jayden, and knew he ate regularly.

Finally, as for the alleged "heart condition," Officer Smith admits she never knew what condition, if any, Jayden had.  For her to swear to a magistrate that Jayden's condition was one that would be exacerbated by "long periods without food, water or heat," is beyond reckless; she is not trained in cardiology, and, short of knowing a diagnosis, she had no idea what she was talking about.

A reasonable jury could also find that Officer Smith omitted the these material facts, either knowingly or recklessly:

- Jayden's age or grade level.

- Jayden was not experiencing *any* physical pain.

- Jayden's incessantly skipping classes and across-the-board failing grades.

- Jayden's ongoing misbehavior by leaving school and going to the Brandon Glen apartments, despite being told "a million times" that he will no longer be picked up if he went there.

- Kameron's years-long efforts to help her son, who consistently disobeys her orders does whatever he wants.

[See, e.g., Doc. 65-1 at 26-27, ¶¶ 6-9.]

What seems to have been lost on Officer Smith is the severity and scope of a child-cruelty crime. Subsection (a) prosecutions deal with chronic and extreme cases of malnourishment, almost always involving infants or young children. The victims are reliant on a parent or guardian to feed them. They are not old enough to join the military or marry. Officer Smith testified that she saw Jayden on the campus without "food or water" on an "accumulation of days" and, on or by September 27, a subsection (a) crime had occurred. [Doc. 55 at 138:17-139:19.] She could not be more

wrong.  While Jayden was on campus, high school athletes were practicing their sports and not eating, and their parents were not committing child abuse, either.  [See Doc. 55 at 140:24-144:23.]

Subsection (c) prosecutions primarily address excessive physical pain.  By its terms, of course, the statute reaches excessive mental pain, but the types of injury associated with excessive mental pain arising from criminal negligence are a far cry from the facts of this case.  The District Court erred when it considered Jayden's being "upset about his school pick up situation" to be a factor of child abuse under subsection (c).

The District Court held that, "[e]ven if [Smith] were aware of these alleged facts, [Kameron] does not explain why they would be relevant, let alone material, in the warrant applications."  [Doc. 72 at 26.]  Had a magistrate judge learned about the years of Jayden's lying, stealing, and truancy, and Kameron's never-ending efforts to help her son, certainly the magistrate would not have found probable cause to believe that she was *wilfully* depriving Jayden of necessary sustenance or that she was *criminally negligent* in causing *excessive physical or mental pain* to Jayden by asking

him remain at school one and one-half to two hours after the last bell – so that she could pick him up, and so that he could stay in his chosen school.

All this information was easily accessible to Officer Smith had she attempted to conduct a competent child-neglect investigation, something that she had virtually no experience in doing. Removing the false and reckless facts Officer Smith included in her warrant application, and including the omitted facts, there was no (arguable) probable cause. A reasonable jury could find Smith's conduct went well beyond negligence. Because a reasonable jury would have ample evidence from which to conclude that Officer Smith violated Franks, she is not entitled to qualified immunity or to summary judgment. See United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980) (where an officer makes misstatements so "clearly critical to a finding of probable cause . . . the fact of recklessness may be inferred from proof of the omission itself."); Holmes v. Kucynda, 321 F.3d 1069 (11th Cir. 2003) (where a jury could find an officer's statements used to procure a warrant were in "reckless disregard of the truth," qualified immunity was inappropriate); Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir. 1994);(where "a reasonable police officer would have known that [their]

40

testimony was not just negligently false, but recklessly so," qualified immunity inappropriate); <u>Daniels</u>, 487 F. App'x 532 (fact question as to recklessness where discrepancies "should have led a reasonable officer to harbor serious doubts").

**II.      Kameron has stated a valid state-law claim for malicious prosecution.**

Under O.C.G.A. § 51-7-40, a "criminal prosecution which is carried on maliciously and without any probable cause and which causes damage to the person prosecuted shall give him a cause of action." In Georgia a government official "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const. art. 1, § 2, ¶ IX(d). There is no dispute here that Officer Smith was performing discretionary duties as a city official when she applied for the arrest warrants of Kameron. The only question is whether Smith acted with actual malice or intent to cause injury when doing so.

Actual malice "requires a deliberate intention to do wrong," which is something more than simple ill will. <u>Adams v. Hazelwood</u>, 271 Ga. 414, 415 (1999). Here, Officer Smith argues that Kameron "has no evidence of

wicked motive or evil intent," but instead "relies on the absence of probable cause." [Doc. 53-2 at 25.] But evil intent, one can and must infer, exists on this record.

Begin with the fact Officer Smith did not like the methods that Kameron was using to parent Jayden. Officer Smith had grown close to Jayden, spending enough time with him to engage in dubious conduct and receive police reprimands for it. When Smith called Kameron to question her about Jayden's after school activities, Smith went well beyond her role as an SRO to one of an armchair social worker, while threatening Kameron with criminal child neglect charges. Kameron was not having it. Kameron knew that she -- not Jayden -- was the victim of Jayden's endless disobedience and disrespect. And when Kameron referred to Officer Smith as "that bitch," that did it for Smith. Everything from that point forward was a rouse to put Kameron in jail. The sloppy warrants. The welfare-check call. Smith knew that the act of a 17-year-old man staying for a couple of extra hours on school campus, or going to an apartment against the repeated warnings of his mother and then feigning abandonment, were

(and are) not remotely close to what 'cruelty to children' entails.  Not even close.

A jury could reasonably find evil intent here.  <u>See, e.g.</u>, <u>Lagroon v. Lawson</u>, 328 Ga. App. 614 (2014) (jury could conclude reasonably that officers acted with actual malice where direct evidence existed that the officers coerced teenage witnesses to give false statements, used the statements as grounds for plaintiffs' arrests "despite knowing of the statements' falsity, inaccuracy or unreliability," sought grand jury charges "despite knowing that [plaintiffs] had not committed any offenses," used an interrogation to question plaintiff about her estranged husband instead of about the case, "bragged to [plaintiff] about testifying against her in her upcoming divorce trial," and concealed exculpatory evidence from the district attorney for nine months); <u>City of Atlanta v. Shavers</u>, 326 Ga. App. 95 (2014), overruled in part on other grounds by <u>Rivera v. Washington</u>, 298 Ga. 770 (2016) (affirming denial of summary judgment based on official immunity where officer arrested plaintiff despite knowing -- based on a witness's express statement and on clear video surveillance footage showing directly that plaintiff had taken no items from the store -- that no probable

cause existed); <u>Bateast v. DeKalb Cnty.</u>, 258 Ga. App. 131 (2002) (no official immunity when officers arrested plaintiff for giving a false name and date of birth when there existed direct evidence that the officers had verified successfully plaintiff's identity before the arrest and, thus, knew that plaintiff had committed no crime).

Apart from the evil intent, there is no probable cause to believe that a grown man (i.e., someone able to marry and serve in the military) is the victim of child neglect when he simply ignores his mother and goes out with friends, or (occasionally) waits on campus after school hours for a ride from mom. The arguments otherwise are difficult to understand.

## Conclusion

For all these reasons, Kameron kindly asks the Court to reverse the District Court's ruling and remand this matter for further proceedings.

This 26th day of August, 2022.

<div style="margin-left:50%">

Respectfully submitted,

BY: <u>/s/ Cary S. Wiggins</u>
Cary S. Wiggins
Ga. Bar No. 757657

</div>

WIGGINS LAW GROUP, LLC
Suite 401

260 Peachtree St., NW
Atlanta, GA 30303
Telephone: (404) 659-2880
cary@wigginslawgroup.com

BY: /s/ Craig Goodmark
Craig Goodmark
Ga. Bar No. 301428

GOODMARK LAW FIRM
Suite 410
One West Court Square
Decatur GA 30030
Telephone: (404) 719-4848
cgoodmark@gmail.com

# CERTIFICATE OF COMPLIANCE WITH FRAP 32

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8.895 words, as calculated by WordPerfect 12, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using WordPerfect 12 in 14-point Times New Roman.

BY: /s/ Cary S. Wiggins
Cary S. Wiggins
Counsel for Plaintiff/Appellant

A

# CERTIFICATE OF SERVICE

I certify that I have this day served upon the persons below a copy of

the BRIEF OF APPELLANT  by email to:

Frances L. Clay, Esq.
fclay@chrkglaw.com
Chambless, Higdon, Richardson, Katz & Griggs, LLP
P.O. Box 18086
Macon, GA 31209-8086

This 26th day of August, 2022.

BY: /s/ Cary S. Wiggins
Cary S. Wiggins
Ga. Bar No. 757657

WIGGINS LAW GROUP, LLC
Suite 401
260 Peachtree Street, N.W.
Atlanta, Georgia 30303
(404) 659-2880
cary@wigginslawgroup.com